UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
MICHAEL MAXIMILIAN WOLFGANG
ROGGENBACH,                                                    Docket No.: 13 CIV
0221

                      Plaintiff,

              -against-                                    (Baer, J.)


TOURO COLLEGE OF OSTEOPATHIC MEDICINE
and JERRY CAMMARATA,

                 Defendants.
-------------------------------------------------------------------------X


# PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


Leeds Brown Law, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Ste 347
Carle Place, NY  11514
516-873-9550

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................ii

STATEMENT OF FACTS......................................................................................................... 1

ARGUMENT

    I.   DISABILITY DISCRIMINATION ........................................................................... 7

    II.  NATIONAL ORIGIN DISCRIMINATION ........................................................... 18

    III. RETALIATION ....................................................................................................... 21

    IV. SEXUAL ORIENTATION DISCRIMINATION ..................................................... 25

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

Page

Cases

Abbott v. Bragdon,
   107 F.3d 934 (1st Cir. 1997) ........................................................................................11

Abbott v. Bragdon,
   912 F. Supp. 580 (D. Me. 1995)...................................................................................11

Adams v. City of New York,
   837 F. Supp. 2d 108 (E.D.N.Y. 2011)..........................................................................24

Adams v. Master Carvers of Jamestown, Ltd.,
   91 F. App'x 718 (2d Cir. 2004) ....................................................................................16

Alexiadis v. New York Coll. of Health Professions,
   891 F. Supp. 2d 418 (E.D.N.Y. 2012)..........................................................................12

Alexiadis v. New York College of Health Professions,
   10-CV-3509, 2012 WL 4130521 (E.D.N.Y. Sept. 20, 2012)..................................7, 8, 9

Alexiadis v. New York College of Health Professions,
   891 F. Supp. 2d 418 (E.D.N.Y. 2012)............................................................................9

Ballard v. Children's Aid Soc'y,
   781 F. Supp. 2d 198 (S.D.N.Y. 2011) ..........................................................................24

Bennett v. Health Management Sys., Inc.,
   936 N.Y.S.2d 112 (2d Dept. 2011) ..............................................................................18

Boakye –Yiadom v. Laria,
   09-CV-622, 2012 WL 5866186 (E.D.N.Y. Nov. 19, 2012).........................................13

Bragdon v. Abbott,
   524 U.S. 624 (1998) ...........................................................................................9, 10, 11

Brief v. Albert Einstein Coll. of,Med.,
   423 Fed. Appx. 88 (2d Cir. 2011) ................................................................................12

Carlton v. Mystic Transp., Inc.,
   202 F.3d 129 (2d Cir. 2000)..........................................................................................16

Cifra v. G.E. Co.,
  252 F.3d 205 (2d Cir. 2001) ........................................................................................23

D.B. v. Bloom,
  896 F. Supp. 166 (D.N.J. 1995) ....................................................................................8

Dorcely v. Wyandanch Union Free Sch. Dist.,
  665 F. Supp. 2d 178 (E.D.N.Y. 2009) ....................................................................18, 20

Espinal v. Goord,
  558 F.3d 119 (2d Cir. 2009) ........................................................................................13

Fulton v. Goord,
  591 F.3d 37 (2d Cir. 2009) ............................................................................................7

Gangadeen v. City of New York,
  654 F. Supp. 2d 169 (S.D.N.Y. 2009) ........................................................................13

Gilbert v. Related Mgmt. Co., L.P.,
  678 N.Y.S.2d 326 (1st Dep't 1998) ............................................................................12

Gordon v. City of New York,
  242 F.3d 111 (2d Cir. 2000) ........................................................................................14

Graham v. Long Island R.R.,
  230 F.3d 34 (2d Cir. 2000) ..........................................................................................20

Greenwich Citizens Committee, Inc. v. Counties of Warren & Washington Indus. Dev. Agency,
  77 F.3d 26 (2d Cir.1996) ..............................................................................................24

Khan v. Hip Centralized Lab. Servs., Inc.,
  No. 03 Civ. 2411 (DGT), 2008 WL 4283348 ..............................................................23

Kreisler v. Second Ave. Diner Corp.,
  10 CIV. 7592 RJS, 2012 WL 3961304 (S.D.N.Y. Sept. 11, 2012) ..............................12

Kwan v. Andalex Grp. LLC,
  737 F.3d 834 (2d Cir. 2013) ......................................................................16, 21, 22, 23

Lederer v. BP Products N. Am.,
  04 CIV. 9664, 2006 WL 3486787 (S.D.N.Y. Nov. 20, 2006) ......................................11

Levine,
  565 F. Supp. 2d at 428 ..................................................................................................12

Loeffler v. Staten Island Univ. Hosp.,
    582 F.3d 268 (2d Cir. 2009) .......................................................................20

Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,
    263 F.3d 208 (2d Cir.2001) .........................................................................21

Mandell v. Cnty. of Suffolk,
    316 F.3d 368 (2d Cir. 2003) .......................................................................14

McCowan v. HSBC Bank USA, N.A.,
    689 F. Supp. 2d 390 (E.D.N.Y. 2010) ........................................................12

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
    715 F.3d 102 (2d Cir. 2013) .......................................................................25

Miloscia v. B.R. Guest Holdings, LLC,
    33 Misc. 3d 466 (N.Y. Sup. Ct. 2011) ...........................................................7

Missick v. City of New York,
    707 F. Supp. 2d 336 (E.D.N.Y. 2010) ........................................................21

Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,
    429 U.S. 274 (1977) ...................................................................................24

Pacheco v. New York Presbyterian Hosp.,
    593 F. Supp. 2d 599 (S.D.N.Y. 2009) .........................................................18

Petri v. Bank of New York Co., Inc.,
    582 N.Y.S.2d 608 (N.Y. Sup. Ct. 1992) ......................................................12

Phillips v. City of New York,
    66 A.D.3d 170, 884 N.Y.S.2d 369 (N.Y. App. Div. 2009)..............................12

Reddy v. Salvation Army,
    591 F. Supp. 2d 406 (S.D.N.Y. 2008) .........................................................15

Reeves v. Johnson Controls World Servs.,
    140 F.3d 144 (2d Cir. 1998) .........................................................................9

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) ..............................................................................17, 23

Richardson v. Dep't of Corr. Serv.,
    180 F.3d 426 (2d Cir. 1999) ....................................................................21, 23

Roberts v. Royal Atl. Corp.,
542 F.3d 363 (2d Cir. 2008) ..................................................................................7

Rohn Padmore, Inc. v. LC Play Inc.,
679 F. Supp. 2d 454 (S.D.N.Y. 2010) ..................................................................25

Romanello v. Intesa Sanpaolo, S.p.A.,
22 N.Y.3d 881, 998 N.E.2d 1050 (2013) .............................................................25

Rosa,
86 N.Y.2d at 419 ..................................................................................................25

Salamon v. Our Lady of Victory Hosp.,
514 F.3d 217 (2d Cir.2008) ..................................................................................20

Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,
183 F.3d 155 (2d Cir.1999) ..................................................................................21

St. Mary's Honor Center v. Hicks,
509 U.S. 502 (1993) ..............................................................................................18

Summa v. Hofstra University,
708 F.3d 115 (2d Cir. 2013) .................................................................................13

Teachout v. New York City Dep't of Educ.,
04 CIV. 945, 2006 WL 452022 (S.D.N.Y. Feb. 22, 2006) ..................................10

Tolbert v. Queens,
Coll., 242 F.3d 58 (2d Cir. 2001) .........................................................................19

Tomassi v. Insignia Financial Group, Inc.,
478 F.3d 111 (2d Cir. 2007) .................................................................................19

Treglia v. Town of Manlius,
313 F.3d 713 (2d Cir. 2002) .................................................................................21

Wallace v. Suffolk County Police Department,
04-CV-2599, 2010 WL 3835882 (E.D.N.Y. Sept. 24, 2010) ..............................13

Weissman v. Dawn Joy Fashions, Inc.,
214 F.3d 224 (2d Cir.2000) ..................................................................................21

Weixel v. Bd. of Educ. of City of New York,
287 F.3d 138 (2d Cir. 2002) .................................................................................21

White v. Sears Roebuck & Co.,
     07-CV-4286, 2009 WL 1140434 (E.D.N.Y. Apr. 27, 2009) ........................................9
Williams v. N.Y.C. Housing Auth.,
     61 A.D.3d 62, 872 N.Y.S.2d 27 ................................................................................20

Zeno v. Pine Plains Cent. Sch. Dist.,
     702 F.3d 655 (2d Cir. 2012) .....................................................................................19

Statutes

§ 12101(b)(1) ......................................................................................................................8

42 U.S.C. § 12100 et seq., § 12101(a)(3),(6)-(7), (b)(4)-(5) ..............................................9

42 U.S.C. § 12102(1) ..........................................................................................................9

42 U.S.C. § 12102(4)(A) .....................................................................................................8

42 U.S.C. § 12102(4)(B) .....................................................................................................8

42 U.S.C. § 2000(d) ..........................................................................................................19

N.Y. Exec. Law § 296(4) ...................................................................................................25

Regulations
§ 1630.2(j)(1)(iii) .................................................................................................................8

29 C.F.R. § 1630.2(j)(1) .......................................................................................................9

C.F.R. § 1630.20(j)(1)(i) ......................................................................................................8

N.Y.C. Admin. Code § 8-107(4) ........................................................................................25

## STATEMENT OF FACTS

Plaintiff is a gay male of German national origin, who has been diagnosed with human immunodeficiency virus ("HIV").  (Roggenbach 9-10, 15).[1]  Plaintiff's parents immigrated to the United States from East Germany, where Plaintiff once lived.  (56.1 Counter, ¶ 1).  In August 2008, Plaintiff enrolled as a student of Touro's medical program.  (Ex. 5[2], ¶ 9).  During Plaintiff's time at Touro, he was criticized about his German national origin on numerous occasions.  (Roggenbach 42-43).  On one occasion, during a physical diagnosis class, Plaintiff inquired as to what "kosher" meant.  (Roggenbach 43).  A classmate responded, "leave it to the German to not know that." (Roggenbach 43).  Plaintiff's professor, Dr. Binstock, overheard the conversation but did nothing in response.  (Roggenbach 43).  After the class had ended, Dr. Binstock questioned Plaintiff about whether he was from Germany, if his parents were German, and commented on the complexity of his name.  (Roggenbach 43).  This questioning was offensive, in part, because of the arrogant tone Dr. Binstock took.  (Roggenbach 43-44).  Similarly, Plaintiff felt like an outsider at Touro based upon his German heritage, which became a standing joke amongst his predominately orthodox Jewish peers.  (Roggenbach 46-47, 49-50).  Indeed, Touro bills itself as a "Jewish-sponsored independent institution of higher and professional education" that was "established primarily to enrich the Jewish heritage." (Ex. 6).

On October 8, 2008, Plaintiff was informed that he failed a class taught by Dr. Binstock.  (56.1, ¶ 30).  While the passing grade level was a score of 70, Plaintiff's grade was 69.7.  (56.1 Counter, ¶ 30).  Significantly, Dr. Binstock rounded up the score of at least one Jewish student who had received a score that was a few tenths of a point below 70.  (Roggenbach 105-06, Roggenbach Declaration).  Because Dr.

---

[1] Hereinafter, all citations to deposition testimony will be as follows: ([Last name of deponent] [page number]).  Also, numbered exhibits are attached to the Ostrove Declaration, and lettered exhibits are attached to Millus' Declaration.

[2] Numbered Exhibits are attached to the Ostrove Declaration.

Binstock refused to extend this courtesy to Plaintiff, he was forced to take an additional examination to convert his grade to passing.  (Roggenbach 109).

On February 22, 2010 Dr. Jerry Cammarata (Dean of Students) indicated that Plaintiff was beginning his third year as a student of good standing.  (Ex. 7).  In July 2010, at the outset of his third year, Roggenbach remained a good student with passing grades and he began rotations at St. John's Episcopal Hospital.  (Roggenbach 50-54).  Upon commencing rotations, Roggenbach received positive feedback from the hospital's teaching doctors.  (Roggenbach 38-40).

On September 10, 2010[3], Roggenbach's former landlord, Michael Beltrami, sent a letter to, among other people, Dr. Robert Goldberg (Interim Dean), which Dr. Goldberg received.  (Ex. 8; Goldberg 30).  The letter insinuated that Roggenbach was a homosexual and that he kept a "male sex slave" in his apartment.  (Ex. 8).  Although this letter had nothing to do with Plaintiff's enrollment as a medical student, Dr. Goldberg immediately forwarded this letter to Dr. Cammarata, who reviewed it and placed it in Plaintiff's permanent file.  (Cammarata 70).  Dr. Goldberg also telephoned Beltrami, and had a conversation with him about it.  (Goldberg 13-15).  Beltrami sent a second letter to Dr. Goldberg, dated September 27, 2010, stating, among other things, that Plaintiff was HIV positive.  (Ex. 9).  Dr. Goldberg also received this letter.  (Goldberg 30).  Again, this second letter had nothing to do with Plaintiff's enrollment as a student.  (Ex. 9).

In the same month that Beltrami sent his letters to Dr. Goldberg, a close friend of Plaintiff's who was living with him committed suicide.  (56.1 Counter, ¶ 67-68).  Plaintiff made the funeral arrangements.  (Roggenbach 215).  To make the arrangements, Dr. Lantern (a supervising physician), allowed Roggenbach to be absent on September 29-30, 2010.  (56.1 Counter, ¶ 67).

---

[3] Defendants identify numerous alleged infractions by Plaintiff which occurred prior to this date and are unrelated to their purported reason for removing him from rotations or dismissing him.  Plaintiff responds to the allegations in his 56.1 Counterstatement. but since these events are not the reasons offered for the actions taken against Plaintiff, they are red herrings that do not require a response herein.

On September 27, 2010, Plaintiff e-mailed Geraldine Albrecht (Residency Coordinator) about his upcoming absence.  (56.1 Statement, ¶ 67).  Plaintiff also sent text messages to all members of his rotation team informing them of the upcoming absence.  (56.1 Statement, ¶ 67).  On or about September 30, 2010, Ms. Albrecht received a call from Dr. Al Strojan, (Program Director), reporting that Plaintiff was absent, and Dr. Strojan incorrectly said that Plaintiff had not given prior notice of the absence. (56.1 Statement, ¶ 67).  That same day, Dr. Strojan created a counseling memo for Plaintiff, alleging he had been absent without permission, had made errors on a patient list, and stated that Plaintiff would no longer be permitted to participate in the rotation supervised by Dr. Strojan.  (56.1 Statement, ¶ 69; Ex. 10).  Dr. Strojan presented this counseling memo to Plaintiff on October 1, 2010, and told Plaintiff that he wanted him to be reassigned, but the reassignment was not a punitive measure.  (56.1 Counter, ¶ 69).

Because Plaintiff had not actually made any errors to the patient list, and he obtained permission for his absence, he refused to sign the counseling memo without an addendum.  (56.1 Counter, ¶ 69). Dr. Strojan agreed to make an addendum, but none was ever created.  (56.1 Counter, ¶ 69).  On October 5, 2010, a mere six days after Beltrami's second letter, Dr. Cammarata pressured Plaintiff to sign the counseling memo, without the addendum.  (56.1 Counter, ¶ 69).

Plaintiff was removed from Dr. Strojan's rotation that same day, but was never given any written charges.  (Roggenbach 39-42, 56.1 Statement, ¶ 71).  The same day, Dr. Zebulon Taintor (Dean) stated in a venomous tone that one might perceive Plaintiff's "brusque German manner" as aggression when viewed in an American context, which he explained was likely the reasons for Plaintiff's "failings and conflicts." (Roggenbach 39-42)[4].  Additionally, on the same day, an anonymous letter was received by Dr. Cammarata, which purported to be from a second year resident.  (Ex. 11; Rogenbach 239).  The letter claimed Plaintiff yelled at residents and students in his surgical rotation, and that he also falsely accused these individuals of conspiring against him.  (Ex. 11). None of these allegations were true.  (Roggenbach 239).  Significantly, the surgical rotation

---

[4] Dr. Taintor also had access to the Beltrami letters.  (Ex. 12, No. 4)

referenced in this letter ended in July 2010, almost three months earlier, yet the letter was allegedly not sent until the day plaintiff was removed from his rotations.  (Roggenbach 239).

On October 6, 2010, based on the anonymous letter and Plaintiff's September 29-30 absences, Dr. Cammarata summoned Plaintiff to a meeting with Defendants' attorneys and a panel, including two deans and a psychologist, which Defendants characterize as an "informal" hearing.  (56.1 Counter, ¶ 79; Cammarata 42-43).  One of the panel members, Suzannah Callaghan, admitted at her deposition that Dr. Cammarata and Dr. Taintor were concerned about the letters they received from Beltrami regarding Plaintiff at the time they asked her to become a panel member, and Dr. Taintor specifically said these letters included details of Plaintiff's sexual orientation and his male lover as an example of Plaintiff's alleged lack of professionalism.  (Callaghan 10-13, 37, 66).  Dr. Cammarata also confirmed that he was concerned about the contents of the letters.  (Callaghan 14).  Callaghan admitted Plaintiff's HIV positive status was raised at the hearing, but claimed she did not remember any details.  (Callaghan 35).  Plaintiff's HIV positive status, his sexual orientation, and the information contained in the Beltrami letters had nothing to do with Plaintiff's absences, or the anonymous letter regarding the surgical rotation.  Thus, they were wholly unrelated to any legitimate reason for discipline and should not have been discussed.

At the hearing, Plaintiff was questioned about his behavior and the absences.  (Cammarata 59).  Plaintiff explained he e-mailed Albrecht regarding the absences, and Dr. Cammarata requested a copy of the e-mail.  (56.1 Counter, ¶ 75).  Plaintiff replied that he was unsure whether he could produce it, because he purged his e-mail and computer some time after it was sent.  (56.1 Counter, ¶ 75).  In response, Dr. Cammarata menacingly told Plaintiff "[i]t would not be good for you if you did not have the e-mail." (56.1 Counter, ¶ 75).  Fearful of Dr. Cammarata's threat, Plaintiff recreated the e-mail in its substance, stating, "I am taking two personal days on Wednesday and Thursday this week due to the recent unfortunate suicide of a close friend of mine who has been staying with me but whose family cannot aid in the funeral preparations so it has fallen on me. Please forward this to all concerned persons. Thank you very much in advance for your understanding in this matter," and forwarded it to Dr.

4

Taintor.  (56.1 Counter, ¶¶ 74-75).  Plaintiff was then questioned about whether the e-mail he forwarded was the same e-mail he had sent to Albrecht.  (56.1 Counter, ¶ 79).  Plaintiff admitted to having created a duplicate of the e-mail he had sent to Albrecht because the original had been deleted, apologized, and conceded that he should have just said he did not still have it[5].  (56.1 Counter, ¶ 79).  Plaintiff also attempted to show the panel the text message he sent to his rotation team which evidenced he had given prior notice of his absence, but the panel refused to look at it.  (56.1 Counter, ¶ 83).  Throughout the hearing, Plaintiff maintained his professionalism while defending himself, but nonetheless, Defendants now assert that it was disrespectful for him to have done so.  (56.1 Counter, ¶ 79).  However, Callaghan admitted Plaintiff's demeanor at the hearing was not disrespectful.  (Callaghan 33-34).

The panel then postponed their decision about Plaintiff's reconstructed e-mail, pending a psychological evaluation of Plaintiff by the Committee for Physical Health ("CPH"), and Plaintiff's compliance with any treatment plan they may suggest.  (56.1 Statement, ¶ 81).  CPH issued an Independent Medical Evaluation of Plaintiff on December 7, 2010, recommending therapy.  (Ex. 13).

On March 25, 2011, Plaintiff filed a *pro se* complaint of discrimination with the New York State Division of Human Rights ("DHR"), alleging discrimination and retaliation based on his sexual orientation and HIV positive status[6].  (Ex. 14).  On or about this time, Plaintiff made similar complaints to the Commission on Osteopathic College Accreditation, and also the United States Department of Education - Office for Civil Rights.  (56.1 Statement, ¶ 91).

On May 20, 2011, the "informal" hearing reconvened.   (56.1 Statement, ¶ 91).  Dr. Cammarata claimed Plaintiff refused to sign a FERPA release for his school records to be given to CPH, and that the hearing was reconvened only to discover whether Roggenbach wished to make any additional statements.

---

[5] Defendants have not produced any legitimate evidence that this e-mail was never sent to Albrecht, and plaintiff's representation must be accepted as true on this motion. (56.1 Counter, ¶ 77).

[6] On December 28, 2012, Plaintiff withdrew his DHR complaint to pursue his federal remedies in this case.

(56.1 Statement, ¶ 95). However, Dr. Cammarata admitted in his deposition that Plaintiff provided the FERPA release. (56.1 Counter, ¶ 95). Plaintiff's file contained numerous lies regarding his signing of the FERPA release, which Plaintiff discussed at the hearing. (56.1 Counter, ¶ 95). Plaintiff further complained that he was being subjected to discriminatory and retaliatory treatment based upon the Beltrami letters in his file that alleged he was an HIV positive homosexual, and because he complained to the DHR and other entities. (56.1 Counter, ¶ 95).

On May 26, 2011, more than seven months after the "informal hearing," yet only one month after receiving Roggenbach's DHR Complaint, and six days after Dr. Cammarata responded to it, Cammarata sent Roggenbach a letter indicating the informal hearing committee decided to recommend to Dean Goldberg that Roggenbach be dismissed from Touro. (56.1 Counter, ¶ 5, 97; 56.1 Statement, ¶ 97). Callaghan disagreed with this recommendation, stating that she had not been provided with sufficient information to make such a decision. (Callaghan 53).

On June 3, 2011, Roggenbach requested a formal hearing, which was conducted on August 17, 2011. (56.1 Counter, ¶ 98, 101). Cammarata provided to the panel a detailed chronology of events, including that Plaintiff filed a complaint with the DHR, and Cammarata admitted that he included this fact because he felt it was an important piece of information to be considered. (Ex. 15; Cammarata 90, 95-96). However, Plaintiff's filing of the DHR complaint was irrelevant to the hearing. At the hearing, Plaintiff again conceded that he had reconstituted the e-mail, but had sent a substantively identical e-mail on the same date; Plaintiff also admitted to reconstituting this previously sent e-mail, just as he had explained at the informal hearing. (56.1 Counter, ¶ 104). Thereafter, on August 18, 2011, Plaintiff was dismissed from Touro. (Complaint, ¶ 37).

Another medical student involved in many loud and aggressive verbal incidents directed toward faculty and hospital staff was not dismissed by Defendants, and he was instead given a second chance. (Goldberg 46-47). In a case Callaghan described as similar to Plaintiff's, another medical student stole a prescription pad from a physician's office, and forged a prescription to

6

himself.  (Callaghan 59; Cammarata 48; Goldberg 34-35).  This student, who was never alleged to be gay or HIV positive, had not filed a complaint with the DHR.  Despite the fact his infraction was at least as bad, if not worse, than Plaintiff's alleged infraction, this student was retained.  (Callaghan 59; Cammarata 50; Goldberg 36).  Further, it is within Cammarata's discretion to decide if an informal hearing is just between himself and a student, or if a hearing panel is also involved.  (Cammarata 43-44).  For the student who forged the prescription, Camarata held the hearing between himself and the student.  (Cammarata 48-49).  Cammarata's decision to not only appoint numerous panelists to Plaintiff's hearing, but also to include Touro's attorneys, suggests Defendants knew they were doing something wrong, and were attempting to cover all bases.  (56.1 Counter, ¶ 79).  Further, the inclusion of a psychologist suggests they perceived Plaintiff as having a psychological disorder.

## ARGUMENT

## I.   DISABILITY DISCRIMINATION

A plaintiff can base a disability discrimination claim against a college or university on any of three available theories: (1) intentional discrimination, i.e. disparate treatment; (2) disparate impact; or (3) failure to make a reasonable accommodation.  Fulton v. Goord, 591 F.3d 37 (2d Cir. 2009).  This case is about intentional discrimination.   To state an intentional disability discrimination claim,[7] a plaintiff must show, "(1) that he is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against the plaintiff by denying him a full and equal opportunity to enjoy the services defendants provide."  Alexiadis v. New York College of Health Professions, 10-CV-3509, 2012 WL 4130521, *6 (E.D.N.Y. Sept. 20, 2012) (citing Roberts v. Royal Atl. Corp., 542

---

[7] The Rehabilitation Act and ADA are analyzed substantially similar.  See Alexiadis, 2012 WL 4130521, *8 n.13; North Shore University Hosp. v. Rosa, 86 N.Y.2d 413, 419 (1996) (analyzing defendant's disparate treatment of HIV positive patient);  Miloscia v. B.R. Guest Holdings, LLC, 33 Misc. 3d 466, 473 (N.Y. Sup. Ct. 2011) (further noting a failure to accommodate is just one form of discrimination).

F.3d 363, 368 (2d Cir. 2008)).   As discussed below, each element is satisfied here[8].   Plaintiff's

disparate treatment disability discrimination claims are analyzed below.

**A.      Plaintiff is disabled.**

> **1.      ADA and Rehabilitation Act**

Disability should be construed in the favor of broad coverage. 42 U.S.C. § 12102(4)(A);

C.F.R. § 1630.20(j)(1)(i) ("Substantially limits" is not meant to be a demanding standard."); 42

U.S.C. § 12102(4)(B). The main inquiry is whether there was discrimination, not whether the

individual was disabled. See § 1630.2(j)(1)(iii).

The ADA's goal was to "provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities" and provide "clear, strong,

consistent, enforceable standards addressing discrimination against individuals with disabilities."

(Id. (b)(1)-(2)). The ADAA reaffirmed this goal.  § 12101(b)(1); Section 1630.1(a).

The goal of the ADA and the ADAA supports that the definition of what is considered a

disability or handicap should be applied consistently across similar statutes with the same

definition. It is inconsistent with the goal of consistency to find a person fails one disability

discrimination statute and not another if both statutes define a disability the same way[9]. Thus, in

determining whether Plaintiff is disabled, this Court should use as its guidance the ADA

---

[8] While Defendants make much of the fact Plaintiff never requested any reasonable
accommodations, this is irrelevant to a case such as this, alleging intentional discrimination, as there
is no requirement that a request for a reasonable accommodation be made.  Alexiadis v. New York
Coll. of Health Professions, 891 F. Supp. 2d 418 (E.D.N.Y. 2012) (Genuine issue of material fact,
as to whether HIV positive college student's arrest, suspension, and dismissal were "because of"
disability, precluded summary judgment for college and officials on student's disability
discrimination claim under Title III of ADA.  Plaintiff never requested any accommodations); D.B.
v. Bloom, 896 F. Supp. 166 (D.N.J. 1995) (Allegations of dental patient's complaint and testimony
set forth prima facie case for discrimination under Americans with Disabilities Act (ADA) against
dentist and dental office for refusing to treat patient after discovering that patient had tested positive
for HIV where pleadings and testimony established that patient was denied services and equal
treatment by defendants by virtue of his disability.  Plaintiff never requested any accommodations).
[9] The ADA Amendments made conforming amendments to the Rehabilitation Act to ensure
consistency among the statutes. ADAA, Sec. 7.

Amendments and regulations. <u>Reeves v. Johnson Controls World Servs.</u>, 140 F.3d 144, 150 n.3 (2d Cir. 1998) (ADA regulations entitled to "great deference").   As discussed below, Plaintiff is disabled within the meaning of the statutes.

> **a.      Plaintiff has a disability under the ADA.**

Under the ADA, a disability is, "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."   <u>White v. Sears Roebuck & Co.</u>, 07-CV-4286, 2009 WL 1140434, *6 (E.D.N.Y. Apr. 27, 2009) (quoting 42 U.S.C. § 12102(1)).   In 2008, the ADA was amended to expand the narrow interpretation courts were giving the term "substantially limits" and "major." <u>Alexiadis</u> at 428; American with Disability Acts Amendments ("ADAA"), PL 101–336, 1990 S933, <u>codified</u> <u>at</u> 42 U.S.C. § 12100 et seq., § 12101(a)(3),(6)-(7), (b)(4)-(5); 29 C.F.R. § 1630.2(j)(1).

> **1.      Plaintiff has an impairment within the meaning of the ADA.**

Plaintiff is HIV positive.  "HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection. HIV infection satisfies the statutory and regulatory definition of a physical impairment during every stage of the disease."   <u>Bragdon v. Abbott</u>, 524 U.S. 624, 637 (1998). Thus, Plaintiff has an impairment within the meaning of the ADA.

> **2.      Major life activities.**

Plaintiff's HIV affects the major life activity of reproduction.  The ability to reproduce and to bear children constitutes a major life activity within the meaning of the ADA.  <u>Bragdon</u>, 524 U.S. at 638.  Plaintiff's HIV also affects the major life activity of having a fully functional immune system.  Having a fully functional immune system is also a major life activity.  <u>Alexiadis v. New York Coll. of Health Professions</u>, 891 F. Supp. 2d 418 (E.D.N.Y. 2012).

### 3.   Substantial limitation

Plaintiff's ability to reproduce is substantially limited as a result of his HIV because it substantially impairs his ability to be sexually active.  (Roggenbach 73-74).  Furthermore, HIV, by its very nature, imposes a substantial limitation on normal immune function, and Plaintiff requests the Court take judicial notice of this fact.

### 4.   Defendants' disability cases are inapposite.

Defendants' reliance on <u>Teachout v. New York City Dep't of Educ.</u>, 04 CIV. 945, 2006 WL 452022 (S.D.N.Y. Feb. 22, 2006) for the proposition that Plaintiff's HIV infection does not constitute a disability is misplaced.  In <u>Teachout</u>, which was decided before the ADAA expanded the definition of disability, the defendant claimed the Plaintiff's HIV infection was not a disability because the plaintiff produced no evidence that his HIV infection substantially affected his ability to reproduce, and because the plaintiff testified at his deposition that his HIV infection only caused tiredness, and that he didn't believe there were any activities he couldn't perform in his day to day life as a result of the infection.  The court rejected this argument, holding the lack of such testimony was irrelevant.  In holding that Teachout's HIV infection was a disability, the court reasoned:

> If HIV infection is an impairment, and HIV infection substantially affects the ability to reproduce, and the ability to reproduce is a major life activity, then what place is there for an individualized case-by-case inquiry to determine if HIV infection is a disability for a particular plaintiff? To avoid the creation of a *per se* rule, the Supreme Court in <u>Bragdon</u> noted that the plaintiff had testified that her HIV infection affected her "decision" not to have a child. 524 U.S. at 641-42. <u>Bragdon</u> does not, however, hold that such a statement is required in every case to avoid summary judgment; just three sentences earlier the Court stated that "the disability definition does not turn on personal choice." <u>Id</u> . It <u>is not necessary for a plaintiff to want to have children, or for a plaintiff to plan to have children, to show that his *ability* to have children has been substantially limited by infection with HIV.</u> If, however, a plaintiff were to claim that his HIV infection substantially limited his ability to reproduce, but the evidence in the record showed that he was <u>physically incapable of reproduction</u> for reasons unrelated to his HIV-positive status, such as a voluntary irreversible sterilization, then in that case, the plaintiff would not have a disability under the ADA.

<u>Teachout</u> at*7 (emphasis added).

While not explicitly clear, Defendants seem to argue Plaintiff is not disabled under Teachout because his being gay makes him comparable to a man who had a "voluntary irreversible sterilization" ("Plaintiff, who is admittedly gay, did not allege and cannot establish that his HIV-positive status inhibits his ability to reproduce."). (Def. Mem. at 8).  Defendants offer no case law for this proposition, and to Plaintiff's knowledge, none exists.  However, in Lederer v. BP Products N. Am., 04 CIV. 9664, 2006 WL 3486787 (S.D.N.Y. Nov. 20, 2006), pre-ADAA, this court held that an HIV infection suffered by a gay man constitutes a disability within the meaning of the statute.  Further, while Bragdon does not specify the plaintiff's sexual orientation, it is clear that plaintiff was gay, as he was represented by "Gay & Lesbian Advocates and Defenders, Aids Law Project" at the district and circuit court levels.  Abbott v. Bragdon, 912 F. Supp. 580, 583 (D. Me. 1995); Abbott v. Bragdon, 107 F.3d 934 (1st Cir. 1997) vacated, 524 U.S. 624 (1998).

Defendants also argue Plaintiff does not have a disability, citing Alexiadis.  In Alexiadis, the court held that the plaintiff's advanced HIV infection was a disability because it substantially limited the major life activity of the function of his immune system.  Defendants argue the instant case is distinguishable from Alexiadis, alleging Plaintiff "offered no evidence that his HIV positive status in any way inhibited him at school or otherwise." (Def. Mem. at 8).  But, Plaintiff did offer evidence that his HIV infection played an inhibiting role in his life, testifying that his HIV had "weaponized the act of love," which made it very difficult for him to form and maintain romantic relationships.  (Roggenbach 73-74).  However, whether Plaintiff had provided such evidence is irrelevant because he does not need to show his impairment inhibited him at school.  The Supreme Court squarely held in Bragdon that an HIV infection is considered a disability regardless of whether it has progressed to the so-called symptomatic phase, as it is a physical impairment which substantially limits the major life activity of reproduction.  Bragdon, 524 U.S. at 642.

**b.      Plaintiff was regarded as disabled.**

11

Under the "regarded as having an impairment" test, a plaintiff must show "that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Alexiadis at 418.   In other words, the impairment need not actually limit a major life activity; rather, Defendants need only have acted on their belief, true or not, that Plaintiff had an impairment.   As discussed, an HIV infection constitutes such an impairment.   A mental impairment is also covered by the statutes.   McCowan v. HSBC Bank USA, N.A., 689 F. Supp. 2d 390, 404 (E.D.N.Y. 2010).   Here, a jury could conclude Defendants perceived Plaintiff to have such impairments based upon their receipt of the Beltrami letters, and the actions they took in response to them.   See supra at 2, 4.   Thus, a jury could conclude that Defendants perceived Plaintiff to be HIV positive, and/or that he suffered from a mental impairment.

### 2.      NYSHRL and NYCHRL

The NYSHRL provides broader protections than the ADA.   Brief v. Albert Einstein Coll. of Med., 423 Fed. Appx. 88, 92-93 (2d Cir. 2011); Kreisler v. Second Ave. Diner Corp., 10 CIV. 7592 RJS, 2012 WL 3961304 (S.D.N.Y. Sept. 11, 2012); Phillips v. City of New York, 66 A.D.3d 170, 175, 884 N.Y.S.2d 369, 373 (N.Y. App. Div. 2009).   A disability under the NYSHRL is a condition that either (1) prevents the exercise of a normal bodily function or (2) is "demonstrable by medically accepted clinical or laboratory diagnostic techniques." Levine, 565 F. Supp. 2d at 428. Under the NYSHRL, an HIV infection, regardless of whether it is symptomatic, constitutes a disability.   Petri v. Bank of New York Co., Inc., 582 N.Y.S.2d 608, 611 (N.Y. Sup. Ct. 1992). Whether the plaintiff is gay or straight is irrelevant to the analysis.   Gilbert v. Related Mgmt. Co., L.P., 678 N.Y.S.2d 326, 327 (1st Dep't 1998). The NYCHRL defines disability even more broadly than the NYSHRL.   Brief, 423 Fed. Appx. at 92-93 (2d Cir. 2011); Kreisler, 2012 WL 3961304 at *14.   For the reasons set forth above, Plaintiff is disabled within the meaning of the NYSHRL and NYCHRL.

**B.      Defendants discriminated against Plaintiff**

      **1.      Adverse actions**

Defendants denied Plaintiff a full and fair opportunity to enjoy their services, which manifested itself as various adverse actions taken against him, including (1) removing him from rotations; (2) initiating an informal hearing against him; (3) referring him to CPH; (4) reconvening the informal hearing; (5) recommending that he be dismissed; and (6) dismissing him.

      **2.      Discriminatory animus**

For the reasons set forth below, a jury could conclude that Plaintiff's actual/perceived HIV positive status, and/or his perceived mental impairment, was a motivating factor for each of the adverse actions.

        **a.      Timing and sequence of events**

A causal connection can be established by showing the protected activity occurred close in time to the adverse action.  Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009).  Moreover, a strong temporal connection, without more, is sufficient evidence by which a jury could find a causal connection.  Summa v. Hofstra University, 708 F.3d 115, 128 (2d Cir. 2013);  Wallace v. Suffolk County Police Department, 04-CV-2599, 2010 WL 3835882, *5 (E.D.N.Y. Sept. 24, 2010) (Seybert, J.) ("the jury could have found causation based simply on the temporal proximity").  Here, on September 30, 2010, less than three weeks after Beltrami's first letter was received by Defendants, Dr. Strojan created a counseling memo for Plaintiff, which falsely alleged he had been absent without permission, had made errors on a patient list, and stated that Plaintiff would no longer be permitted to participate in the rotation supervised by Dr. Strojan[10].  (56.1 Statement, ¶ 69 and Ex. 10).  Dr. Strojan

---

[10] A jury could infer Dr. Strojan was aware of the Beltrami letters based upon the timing of the counseling memo.  Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013); Boakye – Yiadom v. Laria, 09-CV-622, 2012 WL 5866186, *15 (E.D.N.Y. Nov. 19, 2012) (even if defendant was unaware of the protected activity, retaliation nevertheless could be and was inferred by other evidence); Gangadeen v. City of New York, 654 F. Supp. 2d 169, 184-85 (S.D.N.Y. 2009) ("If the agent denies direct knowledge, however, a jury could find retaliation if, *inter alia,* 'the jury concludes that an agent is acting explicitly or implicitly upon the orders of a superior who has the

promised to create an addendum to the memo to correct the inaccuracies, but on October 5, 2010, a mere

six days after Beltrami's second letter was received, Dr. Cammarata demanded that Plaintiff sign the

document, absent the addendum, and threatened that Plaintiff could not be placed in another rotation

until he did so, and that refusing to sign "would not be good" for Plaintiff, so plaintiff signed it.  (56.1

Counter, ¶ 69).  Plaintiff was removed from Dr. Strojan's rotation that same day, but was never provided

with any written charges.    (Roggenbach 39-42; 56.1 Statement, ¶ 71).   The following day, Dr.

Cammarata summoned Plaintiff to an informal hearing with Defendants' attorneys and a panel, wherein

his HIV positive status was discussed.  (56.1 Statement, ¶ 79; 56.1 Counter, ¶ 79; Cammarata 42-43;

Callaghan 35).  Cammarata specifically said the Beltrami letters were the reason for the informal hearing.

(Callaghan 10-14, 37, 66).  Defendants then ordered Plaintiff to undergo a psychological examination by

CPH.  (56.1 Statement, ¶ 81).  On May 26, 2011, more than 7 months after the "informal hearing," yet

only one month after receiving Plaintiff's Complaint to the DHR, and six days after Dr. Cammarata

responded to the DHR Complaint, the hearing panel recommended that Plaintiff be dismissed from

Touro.  (56.1 Counter, ¶ 5, 97, 56.1 Statement, ¶ 97).

> **b.** **Direct Evidence**

The fact that the letters and the content was discussed as a reason for holding the informal

hearing, and was considered at the hearing, constitutes direct evidence that the decision makers considered

the letters indicating plaintiff's HIV status and sexual orientation.

> **c.** **Similarly situated individuals were treated differently**

Preferential treatment given to similarly situated individuals outside of a plaintiff's protected

class is a widely accepted method for showing discrimination.  Mandell v. Cnty. of Suffolk, 316

F.3d 368, 379 (2d Cir. 2003).  Significantly, while Plaintiff's reconstituted e-mail to Albrecht and

his absences allegedly formed the basis of Defendants' purported reason for his dismissal, at least

---

requisite knowledge' or there are other circumstances evidencing knowledge" (citing Gordon v.
City of New York, 242 F.3d 111, 116 (2d Cir. 2000));

two other students had engaged in far more serious infractions and were not dismissed.  See supra at 6-7.  Also, Cammarata could have held the informal hearing between himself and a student instead of convening a panel, which was his historical practice.  (Cammarata 43-44, 48-49).

      **c.**        **Pretext**

Defendants argue Plaintiff was dismissed due to numerous infractions that made him unqualified to remain a student.  However, as discussed in section 3 below, these reasons have been inaccurately characterized, and/or have nothing to do with the reasons Defendants gave Plaintiff for why his dismissal had been recommended.

      **3.**        **Defendants' claim that Plaintiff was not qualified to remain a student is without merit.**

Defendants argue Plaintiff cannot succeed on his disability claims because he was not qualified to remain a student.  (Def. Mem. at 12-15).  However, a plaintiff need only make a minimal showing of qualification.  Reddy v. Salvation Army, 591 F. Supp. 2d 406 (S.D.N.Y. 2008). A plaintiff need not demonstrate that his performance was flawless or superior to demonstrate his qualification; rather, he need only demonstrate that he possesses the basic skills necessary for the performance of his position.  Id.  Here, Plaintiff's qualification is demonstrated by the fact that (a) Plaintiff was admitted to Touro (56.1 Counter, ¶ 21; 56.1 Statement, ¶ 21); and (b) Plaintiff remained a student in good standing in his third year.  (Ex. 3).

In Defendants' letter to Plaintiff, dated May 26, 2011, Defendants claimed the reason Plaintiff was recommended for dismissal because he (a) fabricated an e-mail to Albrecht, indicating that he had requested permission to be absent from his rotations on September 29, 2010 and September 30, 2010 in connection with a funeral; (b) was absent from his rotations on these two days; and (c) "demonstrated behavior in a hospital setting unbecoming of a student doctor," which was an apparent reference to the anonymous letter Dr. Cammarata received on the date Plaintiff was removed from his rotations, which falsely alleged that almost three months earlier, Plaintiff had

yelled at residents and students in his surgical rotation, and accused them of conspiring against him. (Ex. 16).  However, as discussed below, for the first time, Defendants now argue Plaintiff was not qualified to remain a student based upon a host of purported disciplinary infractions which they inaccurately characterize, including some that have nothing to do with this case.  When a defendant offers inconsistent explanations for an adverse action, a genuine issue of material fact is raised with regard to the veracity of the non-discriminatory reason.  Adams v. Master Carvers of Jamestown, Ltd., 91 F. App'x 718, 724 (2d Cir. 2004); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000); Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013).

Defendants first argue Plaintiff "had one of the lowest GPAs in his class and was a marginal student at best."  (Def. Mem. at 12).  However, Plaintiff's GPA had nothing to do with his dismissal, as his grades were above passing and he was a student in good standing.  (56.1 Counter at ¶ 21, Ex. 7 and 16).

Defendants next argue Plaintiff "willfully forged an e-mail and then lied about it," in reference to his e-mail to Albrecht asking for permission to be absent from his rotations on September 29, 2010 and September 30, 2010 in connection with a funeral.  (Def. Mem. at 12).  First, this fact did not exist at the time the informal panel was convened.  Moreover, Plaintiff never lied about the e-mail.  (56.1 Counter, ¶ 79).  Plainitiff reconstituted the email in fear of Dr. Cammarata's threat.  (56.1 Counter, ¶ 75).  But he conceded that it was a duplicate he created because the original had been deleted, and apologized for doing so.  (56.1 Counter, ¶ 79).

Defendants next argue Plaintiff "had severe time and attendance deficiencies throughout his matriculation at TouroCOM for which he was given numerous warnings.  (Def. Mem. at 13).  While Plaintiff disputes that his class attendance was ever problematic, it had nothing to do with his dismissal.   (56.1 Counter at ¶ 24, Ex. 16).  To the extent Defendants refer to Plaintiff's absence from his rotations on September 29-30, 2010, plaintiff had obtained permission for this absence from Dr. Lantern, e-mailed Albrecht regarding it, and also informed the members of his rotation team via

16

text message.  (56.1 Statement, ¶ 67).  Moreover, even if there was some misunderstanding about a notification, this could not possibly be a reasonable justification for terminating Plaintiff.

Defendants next argue Plaintiff "wrote inappropriate remarks on a hospital document," referencing Dr. Strojan's counseling memo indicating Plaintiff had made errors on a patient list. (Def. Mem. at 12).  However, after Plaintiff explained what he had written on the list and why; Dr. Strojan agreed to provide an addendum to his memo to provide a correction.  (56.1 Statement, ¶ 69). Subsequently, Dr. Cammarata threatened Plaintiff and demanded that he sign the memo, absent any such addendum.  (56.1 Counter, ¶ 69).  Dr. Cammarata's demand came a mere six days after Defendants received Beltrami's letter alleging Plaintiff was HIV positive.  (56.1 Counter, ¶ 69).

Defendants next argue Plaintiff "maintained a caustic and disrespectful attitude towards TouroCOM's administration," in reference to Plaintiff having defended himself at the hearing. (Def. Mem. at 13). However, one of the hearing panelists admitted at her deposition that Plaintiff's demeanor at the hearing was not disrespectful.  (56.1 Counter, ¶ 79).

Finally, Defendants argue Plaintiff "engaged in inappropriate and unprofessional behavior, in reference to the anonymous letter Dr. Cammarata received on the date Plaintiff was removed from his rotations, which falsely alleged that almost three months earlier, Plaintiff had yelled at residents and students in his surgical rotation, and accused them of conspiring against him.  (Def. Mem. at 13).  As discussed, the timing of this letter is highly suspect.  Furthermore, this letter is inadmissible hearsay, as none of the information has ever been corroborated or confirmed, and Plaintiff denies the allegations contained therein.  (56.1 Counter, ¶ 73).

Thus, the reasons Defendants now give for why Plaintiff was dismissed are either inconsistent with the reasons they had previously given, or unsupported by the record.  The falsity of an employer's proffered reason is sufficient evidence for a reasonable juror to infer that the defendant's proffered reason is pretextual.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination

from the falsity of the employer's explanation"); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993) (rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination").   With respect to the NYCHRL, the falsity of an employer's proffered reason compels the denial of summary judgment.   Bennett v. Health Management Sys., Inc., 936 N.Y.S.2d 112, 123 (2d Dept. 2011).  As the court held in Bennett:

> Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to cover up the alleged discriminatory conduct, or an improper discriminatory motive co-existing with other legitimate reasons.  These will be jury questions except in the most extreme and unusual circumstances. Proceeding in this way reaffirms the principle that trial courts must be especially chary in handing out summary judgment in anti-discrimination cases, because in such cases the employer's intent is ordinarily at issue.

Id. (internal citations and quotations omitted).  While this case does not have precedential impact on the Title VI and NYSDHR claims, it is persuasive and it is logical that if a juror believes that one of the reasons for Plaintiff's dismissal was fabricated and/or exaggerated, a jury could use that as a basis to find pretext.

Finally, at least one panelist believed dismissal unwarranted under the circumstances.  (Callaghan 53).  Thus, if one panelist could believe that dismissal was unwarranted, a reasonable juror could also find that dismissal was inappropriate.  Thus, whether dismissal was appropriate, or partially based on other inappropriate factors, is an issue of fact for the jury to decide.

## II.   NATIONAL ORIGIN DISCRIMINATION

### A.   Title VI[11]

---

[11] While some of the cases cited herein relate to Title VII, they are applicable within the context of Title VI because allegations of discrimination under Title VI are analyzed in the same manner as Title VII claims.  Pacheco v. New York Presbyterian Hosp., 593 F. Supp. 2d 599 (S.D.N.Y. 2009); Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 192 (E.D.N.Y. 2009)

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). To establish a Title VI claim, a plaintiff must show that (a) the defendant discriminated against him on basis of race or national origin; (b) the discrimination was intentional; and (c) the discrimination was a substantial or motivating factor for the defendant's actions. Tolbert v. Queens Coll., 242 F.3d 58 (2d Cir. 2001). In an educational setting, a school is liable for intentional discrimination when it has been "deliberately indifferent" to teacher or peer harassment of a student. Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655 (2d Cir. 2012). Plaintiff's national origin claim is analyzed below.

### 1. Defendants intentionally discriminated against Plaintiff based on his German national origin.

Plaintiff was criticized about his German national origin on numerous occasions while at Touro, which included unequal treatment in his grading, negative comments about his nationality from students and teachers, and removal from rotations immediately followed by a derogatory comment by a decision maker. See supra 1-3. Where a remark "evinces a discriminatory state of mind, and the closer the remark's relation to the alleged discriminatory behavior, the more probative that remark will be." Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115-16 (2d Cir. 2007). Based on the foregoing, a jury could infer that Defendants intentionally discriminated against Plaintiff.

### 2. The discrimination was a motivating factor.

A jury could infer that Defendants' discriminatory animus toward Plaintiff's national origin was a motivating factor in Dr. Binstock's refusal to round Plaintiff's grade up to passing, where he extended this courtesy to at least one of Plaintiff's similarly situated, non-German classmates. A plaintiff may raise an inference of discrimination by showing that the defendant treated him less

19

favorably than similarly situated individuals outside his protected group.  Graham v. Long Island R.R., 230 F.3d 34 (2d Cir. 2000)[12].  Similarly, a jury could infer that Defendants' discriminatory animus toward Plaintiff's national origin was a substantial or motivating factor in his dismissal, based upon the fact that the false allegations of truancy, which were made contemporaneously with Dr. Taintor's negative remarks about Plaintiff's national origin, were later cited by Defendants as a factor in their recommendation that he be dismissed from Touro.  (Ex. 16).

### 3. Deliberate indifference

Defendants argue there is no deliberate indifference, falsely claiming Plaintiff's national origin claim is limited to Dr. Taintor's comment about Plaintiff's "brusque German manner," and citing to numerous cases involving a single incident that was held not to constitute deliberate indifference.  (Def. Mem. 19-20).  As discussed above, Plaintiff's national origin claim is not limited to a single incident, and therefore these cases are inapposite.  Moreover, the same arguments regarding pretext as set forth above apply to the national origin claim and Plaintiff refers the Court to our arguments set forth above.

## B. NYSHRL and NYCHRL

Discrimination claims brought under the NYSHRL proceed under the same analytical framework as Title VI claims. Salamon v. Our Lady of Victory Hosp., 514 F.3d 217 (2d Cir.2008).  For the reasons set forth above, Plaintiff has a viable NYSHRL national origin claim.  Discrimination claims under the NYCHRL "must be reviewed independently from and 'more liberally' than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009).  Pursuant to the New York City Civil Rights Restoration Act, N.Y.C. Local Law No. 85 (2005), "courts [must] be sensitive to the distinctive language, purposes, and method of analysis required by the [NYCHRL], requiring an analysis more stringent than that called for under either Title VII or the [NYSHRL]." Williams v. N.Y.C. Housing Auth., 61 A.D.3d 62, 872

---

[12] Whether two individuals are "similarly situated" ordinarily presents question of fact for jury. Id.

N.Y.S.2d 27, 30–31 (1st Dep't 2009).  For the reasons set forth above, Plaintiff has a viable national

origin claim under the NYSHRL and NYCHRL.

## III.   **RETALIATION**

### A.   **Title VI**

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in a

protected activity; (2) the defendant was aware of this activity; (3) the defendant took adverse action

against him; and (4) a causal connection exists between the alleged adverse action and the protected

activity.  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  With respect to the fourth

element, a plaintiff must prove, by a preponderance of the evidence, that the adverse action was

taken by the defendant because of his complaints of discrimination.  Kwan v. Andalex Group, Inc.,

737 F.3d 834 (2d Cir. 2013).  Plaintiff need not prove that retaliation was the only reason; he need

only show that the Defendants would not have terminated him absent a retaliatory motive.  Id.

When a defendant proffers an alleged legitimate business reason for the adverse actions, it is

incumbent upon plaintiff to then demonstrate that this reason is pretextual in nature.  Richardson v.

Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999).  ADA Retaliation claims are analyzed under

the same burden-shifting framework established for Title VII cases.  Weixel v. Bd. of Educ. of City

of New York, 287 F.3d 138, 148 (2d Cir. 2002) (stating the elements of a retaliation claim under

Rehabilitation Act and ADA); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d

Cir.2001) ("We analyze a retaliation claim under the ADA using the same framework employed in

Title VII cases.").  Retaliation claims under the NYSHRL and NYCHRL are analyzed in the same

fashion.  Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir.2000); Sarno v. Douglas

Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.1999); Missick v. City of New York, 707

F. Supp. 2d 336 (E.D.N.Y. 2010).  Plaintiff's retaliation claim is analyzed below.

### 1.    **Plaintiff engaged in a protected activity.**

Plaintiff engaged in a protected activity when he (a) filed a complaint of discrimination with the DHR on March 25, 2011 (Ex. 14); (b) filed complaints about discrimination and retaliation to the Commission on Osteopathic College Accreditation, and to the United States Department of Education - Office for Civil Rights  (56.1 Statement, ¶ 91); and (c) complained at his hearing that he was being subjected to discrimination and retaliation.  (56.1 Counter, ¶ 95).

### 2.      Defendants were aware of Plaintiff's protected activities.

Defendants responded to Plaintiff's complaint with the DHR and other entities, and were present at the hearing in which he complained of discrimination and retaliation.  Moreover, Plaintiff does not need to show that any particular defendant was aware of the protected activities.  A plaintiff may rely on general corporate knowledge of his protected activity to establish the knowledge prong of their prima facie case.  Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834 (2d Cir. 2013).

### 3.      Defendants subjected Plaintiff to adverse actions.

Only a few weeks after Defendants received notice of Plaintiff's DHR complaint (and his related complaints with other entities), on May 20, 2011, Defendants reconvened the hearing, and recommended that Plaintiff be dismissed.[13]  (56.1 Counter, ¶ 97, 56.1 Statement, ¶ 97).  On June 3, 2011, Plaintiff requested a Formal Hearing.  (56.1 Counter, ¶ 98).  On August 17, 2011, Defendants held the formal hearing, and dismissed him the following day.  (56.1 Counter, ¶ 101; Ex. 5, ¶ 37).

### 4.      Causation

Defendants argue they did not learn of Plaintiff's DHR complaint until March 2011, which was after the first part of the informal hearing was held, and therefore Plaintiff cannot establish that the their decision to recommence the informal hearing was because of Plaintiff's DHR complaint.

---

[13] At least one panelist believed dismissal unwarranted under the circumstances.  (Callaghan 53).

(Def. Mem. at 16).  Defendants gloss over the fact the hearing panel stayed their decision at the close of the first part of the informal hearing.  (56.1 Statement, ¶ 81).  Thus, a jury could infer pretext from the close temporal proximity between Defendants' receipt of Plaintiff's DHR complaint, and the date the informal hearing was recommenced.  It is well established that the "causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal quotations omitted); Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426, 444 (2d Cir. 1999) (one month proximity may establish causal connection); Khan v. Hip Centralized Lab. Servs., Inc., No. 03 Civ. 2411 (DGT), 2008 WL 4283348, *4 (S.D.N.Y. Sept. 17, 2008 (six month proximity may establish causal connection).

While Dr. Cammarata claimed the reason the informal hearing was reconvened was because Plaintiff refused to sign a FERPA release for his school records to be given to CPH, he admitted in his deposition that Plaintiff did provide the FERPA release.  (56.1 Statement, ¶ 95; 56.1 Counter, ¶ 95).  This inconsistency, can also provide further basis to support the impropriety of Defendants' actions, and therefore support all of the aforementioned causes of action, as well as the retaliation claim. The falsity of a defendant's proffered reason is sufficient evidence for a reasonable juror to infer that the defendant's proffered reason is pretext for intentional retaliation.  Kwan v. Andalex Grp. LLC, 737 F.3d 834 (2d Cir. 2013); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation").

After Plaintiff requested a formal hearing, Dr. Cammarata created a chronology of selected documents from Plaintiff's permanent file that he felt were relevant to the decision on what to do with Plaintiff.  (Ex. 15; Cammarata 90, 95-96).  Plaintiff's DHR complaint is explicitly referenced in this chronology.  (Ex. 15).  Accordingly, a jury could infer that Plaintiff's DHR complaint

partially motivated Defendants' decision to dismiss him.  Defendants cite numerous cases involving plaintiffs who had been reprimanded prior to their protected activities, and appear to be making an argument based upon the principles of Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), although they do not cite the case or any of its progeny.  (Def. Mem. 16).  Under Mt. Healthy, even if there is evidence that the adverse employment action was motivated in part by a protected activity, a defendant can avoid liability if he can show that it would have taken the same adverse action in the absence of the protected speech.  Such an argument is based on Defendants' claimed motivation, and justification, for dismissing Plaintiff, as to which material facts are in dispute. The Second Circuit has explained that where, as here, the plaintiff's protected conduct was a "unitary event that could prompt either a permissible or an impermissible reason on the part of the defendant to act," claims of alleged retaliation require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct. Greenwich Citizens Committee, Inc. v. Counties of Warren & Washington Indus. Dev. Agency, 77 F.3d 26, 33 (2d Cir.1996).  Thus, Defendants cannot rely on a Mt. Healthy defense.

**B.    NYSHRL and NYCHRL**

Retaliation claims under the NYSHRL proceed under the same analytical framework as Title VI claims.  Ballard v. Children's Aid Soc'y, 781 F. Supp. 2d 198 (S.D.N.Y. 2011).  Unlike Title VI and the NYSHRL, retaliation claims under the NYCHRL do not require the plaintiff to prove any materially adverse employment action. Instead, plaintiffs "must prove that something happened that would be reasonably likely to deter a person from engaging in a protected activity. Adams v. City of New York, 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011).  Moreover, as noted above and below, NYCHRL claims are subject to a much more liberal standard in general.  For the reasons set forth above, Plaintiff has a viable retaliation claim under the NYSHRL and NYCHRL.

**IV.**     **SEXUAL ORIENTATION DISCRIMINATION**

The NYSHRL and NYCHRL prohibit discrimination in places of public accommodation based on a person's sexual orientation or perceived sexual orientation.  N.Y. EXEC. LAW § 296(4); N.Y.C. ADMIN. CODE § 8-107(4);  see also Rohn Padmore, Inc. v. LC Play Inc., 679 F. Supp. 2d 454, 460-61 (S.D.N.Y. 2010).  Such claims are analyzed under the McDonnell-Douglas burden shifting framework, requiring a plaintiff to show: (1) membership in a protected class; and (2) defendant's treatment of plaintiff was based on his membership in the protected class. Id.;  Rosa, 86 N.Y.2d at 419.  The factual and legal analysis of Plaintiff's sexual orientation claim overlaps with his disability claim, which is discussed above.  However, with respect to Plaintiff's NYCHRL claim, Plaintiff notes such claims must be analyzed separately and independently from any federal and state law claims.  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013).  The NYCHRL affords protections broader than the NYSHRL or federal statutes, and the provisions of the NYCHRL should be construed broadly in favor of discrimination plaintiffs, to extent that such construction is reasonably possible.  Romanello v. Intesa Sanpaolo, S.p.A., 22 N.Y.3d 881, 998 N.E.2d 1050 (2013); Local Law No. 85 (2005) of City of N.Y. § 7, amending Administrative Code § 8–130 (declaring that the provisions of the City HRL "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws ... have been so construed").  For the reasons set forth above, both standards are met.

## CONCLUSION

For the reasons discussed herein, Defendants' motion should be denied in its entirety.

Dated: Carle Place, New York
     January 29, 2014

               Respectfully submitted,

               LEEDS BROWN LAW, P.C.
               *Attorneys for Plaintiff*
               One Old Country Road, Suite 347
               Carle Place, N.Y. 11514
               (516) 873-9550
               By:_____/s/_____
                      Rick Ostrove
                   Matthew Weinick